UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

LaCARL MARTEZ DOW,

    Petitioner,

vs.

TOM L. CAREY, Warden,

    Respondent.

No. C 06-1219 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

Petitioner's first trial ended in a hung jury. Ex. 4 at 370.[1] At his second trial he was convicted by a jury of second degree robbery. Ex. 12 (opinion of the California Court of Appeal) at 1*; see* Cal. Penal Code § 212.5(c). He was sentenced to prison for fifteen years. Pet. at 2. The California Court of Appeal affirmed the sentence and conviction, and the Supreme Court of California denied a petition for review. Ex. 12 (court of appeal opinion), 14 (denial of petition for review).

Petitioner then filed his original petition in this case. Respondent moved to dismiss the petition as mixed; the court denied the motion and granted petitioner's request for a

---

[1] Citations to "Ex" are to the record lodged with the court by the Attorney General.

stay to allow him to return to state court and exhaust what he conceded were unexhausted issues. Upon exhaustion, petitioner filed an amended petition in this court and the court lifted the stay. The amended petition is the operative petition in this case. The amended petition omits what was labeled claim four in the original petition, a claim that the trial court erred by failing to instruct sua sponte on a lesser included offense; that claim thus is no longer in the case.

The following facts are excerpted from the opinion of the California Court of Appeal:

> The robbery victim, Felix Sablad, testified that he was born in the Philippines and immigrated to the United States five years ago, when he was 20 years old. On the night of November 2, 2002, he worked as a cashier in the convenience store at the Olympian Gas Station on Junipero Serra Boulevard in Daly City. The assistant manager of the store was in a separate office "doing the paperwork."
>
> Just before 10:00 p.m., defendant entered the store, approached the cash register, and asked Sablad "for a certain type of medication." Sablad told defendant "that we don't have it," whereupon defendant "roamed all around the store" "like he was looking for something." After the two other customers in the store "went outside," defendant returned to the register, placed a package of gum on the counter, and briefly engaged Sablad in some idle conversation. As Sablad opened the cash register, defendant produced a "very small silver handgun." He ordered Sablad to "hand him the money" in the register. Sablad was frightened, but placed the money on the counter with his left hand as he attempted to press the "panic button" at the bottom of the cash register with his right hand. Defendant yelled, "what the fuck are you doing, man," and "aimed the gun" at Sablad's head. Sablad turned away from defendant to indicate to him to "take away the money." Defendant took the money from the register, less than $300, and "ran outside."
>
> Sablad pushed the panic buttons on both cash registers and yelled to the assistant manager, "call the police. We were robbed." He then followed defendant to a nearby parking lot, and observed him drive away at a "high rate of speed" in a silver sedan with a "spoiler and a big muffler." No one else was in the car with defendant.
>
> Daly City Police Officer Richard Woodworth testified that he arrived at the scene within 5 to 10 minutes of the robbery report, and took a description of the suspect from Sablad: "an African-American male, dark-skinned, medium build approximately five foot ten inches tall to six feet tall," 25 to 35 years old, with a "scar somewhere on his face." According to Sablad, the man was "wearing a plain gray sweatshirt and sweat pants and a ball cap." Sablad described the man's car as "a small, light-colored or possibly silver vehicle with a spoiler on the trunk." Months later, Sablad told the investigating officers that "he just remembered that the robber was missing a tooth."
>
> Officer Woodworth received a videotape the surveillance cameras in the store had taken of the "cash register area" during the robbery. The cameras were not directed to "the point where the robbery actually physically occurred" at the counter, although some poor quality "still photos" of the robbery suspect were taken from the videotape. The photographs produced from the store videotape were not of "good

enough quality" to make an identification. The counter near the cash register was dusted for fingerprints. The two partial fingerprints that were recovered did not have "enough points" to make "a positive match."

During the course of his investigation of the case, Detective Gregg Oglesby of the Daly City Police Department reviewed the description of the suspect given by Sablad, examined the videotape, and on January 9, 2003, executed a search warrant at defendant's residence. Detective Oglesby did not find the "small, silver chrome handgun" described by the victim, but he did seize a "gray matching sweatsuit" in a hallway closet that "looked like a match for the sweatsuit that the perpetrator was wearing in the video." When the gray sweatsuit was exhibited to Sablad at trial he declared, "That's the clothes that the robber was wearing during the robbery."

Detective Albert Cisneros took a .25-caliber silver handgun from his "personal collection" and showed it to Sablad. The handgun "matched the description given" by Sablad of the gun used by the robber. Sablad indicated to Detective Cisneros that the gun was "similar" to the one used by the robber. At trial, Sablad testified that the gun pointed at him by the robber was "exactly" the size of the .25-caliber silver handgun.

On January 16, 2003, Detective Oglesby prepared a photo lineup for Sablad to view that included defendant's photograph among eight other "African-American males," with both light skinned and dark skinned complexions. Sablad erroneously testified at trial that he believed he was shown six rather than nine photographs by Detective Oglesby. Before presenting the photo lineup Oglesby read the standard admonition form which advised Sablad that the person who committed the crime "may or may not be in the group of photographs," and he was not "obligated to identify anyone." Sablad selected defendant's photograph, number seven, from among those "spread on the table before him" as one that "resembles" the robber.

Sablad subsequently viewed a "live lineup". Defendant chose four other subjects he felt were "similar" in appearance to stand in the lineup with him. Detective Oglesby testified that at defendant's request all of the persons who appeared in the lineup had a "band-aid placed underneath the right eye." Sablad was given the same lineup admonitions before looking at the subjects through a one-way mirror, and again identified defendant, who was in position number two.

Sablad also positively identified defendant as the robber at trial. Sablad testified that he made a distinct effort to focus on the robber during the crime and identify "the right person" at trial. He expressed confidence in his identification of defendant, and "really remembered his face," although he was troubled by his inability to observe the scar on defendant's face that he recalled from the robbery. Testimony was presented at trial that defendant has a small scar below his right eye that is visible from "a foot or two away," but not from "a distance." He also has "a gap" between his two front teeth.

Ex. 12 at 1-4.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003). "Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in

4

the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

## DISCUSSION

As grounds for habeas relief, petitioner asserts that: (1) his trial counsel was ineffective; (2) the prosecutor committed misconduct by eliciting and failing to correct false testimony from a witness, and by using the testimony in closing argument; (3) his due process rights were violated by unduly suggestive identification procedures; (4) his due process rights were violated by the trial court's admission into evidence of a handgun; and (5) the cumulative effect of the alleged errors was an unfair trial, constituting a violation of due process.

**I.     Ineffective Assistance of Counsel**

Petitioner contends that his trial counsel was ineffective in that he (1) failed to impeach prosecution witness Felix Sablad with inconsistent prior testimony; and (2) failed to object to the incorrect testimony given by prosecution witness Detective Oglesby regarding who made the request to place bandages under participants' right eyes during the live lineup.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

First, the defendant must show that counsel's performance was deficient, that is, that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. The relevant inquiry is not what defense counsel could have done, but rather whether the

choices made by defense counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Second, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In other words, where the defendant is challenging his conviction, the appropriate question asks if there is a reasonable probability that, "absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

The *Strickland* prejudice analysis is complete in itself. Therefore, there is no need for additional harmless error review pursuant to *Brecht v. Abrahamson*. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (noting with approval district court's refusal to consider whether counsel's conduct was deficient after determining petitioner could not establish prejudice).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Williams v. Taylor*, 529 U.S. at 405-07. On habeas review, applying §2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others

reflects trial tactics rather than 'sheer neglect.'" *Id.* at 790. "If the state court's rejection of *either* element of Petitioner's claim was reasonable, habeas relief is not available, because the Supreme Court requires that *both* elements be present to prevail." *Brodit v. Cambra*, 350 F.3d 985, 992 (9th Cir. 2003).

### A. Failure to Impeach Witness

Petitioner's first trial ended in a mistrial because the jury was hopelessly deadlocked. Ex. 4 at 370. In the first trial, Sablad testified that he observed petitioner in the courtroom dressed in an orange jail-issued jumpsuit just prior to the physical lineup. Ex. 4 at 154. However, at petitioner's second trial (where petitioner was convicted), Sablad testified that he had not seen petitioner in court prior to the physical lineup. Ex. 5 at 73. Petitioner contends that his counsel was ineffective for failing to impeach Sablad with respect to this inconsistent testimony. This claim was raised on direct appeal, and the court of appeal concluded that counsel "made a tactical decision that did not fall below an objective standard of reasonableness." Ex. 12 at 10. At a hearing on petitioner's motion for new trial, defense counsel explained that he was aware that Sablad's muddled testimony was mistaken, and pursued the chosen course of conduct out of concern that prosecution's separate rebuttal would not only complicate the trial but also "be more prejudicial than helpful to Mr. Dow." Ex. 8 (transcript of hearing on motion for new trial) at 20. The court of appeal noted that competent counsel might well have "concluded it was not in defendant's interest to subject the witness to impeachment evidence that would ultimately be contradicted," and the counsel might have "feared that presenting the impeachment evidence – and having it rebutted – would only reinforce the identification testimony of the victim." Ex. 12 at 10. The court concluded that absent "definitive indication in the record" of "inexcusable ignorance or oversight" by petitioner's trial counsel, there could be no finding of inadequate assistance of counsel on appeal. *Id.*

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have

been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (citing *United States v. Stern*, 519 F.2d 521, 524 (9th Cir. 1975)).  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

There is no evidence in the record contrary to defense counsel's testimony that he decided not to attempt to impeach the victim with his inconsistent testimony because, in part, doing so would open the door to rebuttal by the prosecution that might be damaging. It is a recognized tactic for counsel to sometimes forgo use of favorable evidence if using it would open the door to damaging rebuttal. *See Brodit v. Cambra*, 350 F.3d 985, 992-93 (9th Cir. 2003).  Petitioner has failed to overcome the strong presumption that counsel's decision was a reasonable exercise of professional judgment.

### B.    Failure to Object to Erroneous Testimony

Petitioner contends that his trial counsel was ineffective because he did not object to inaccurate testimony given by a prosecution witness, Detective Oglesby.  Oglesby testified that it was petitioner who requested that bandages be placed below the eyes of all participants in the live lineup; however, as petitioner's counsel was aware, it was counsel who made that request.  Although the state appellate court found that an objection to Detective Oglesby's testimony "may have been successful and advisable," that court also found that counsel's failure to object was not prejudicial. Ex.12 at 11.  This was because the jury would not have attached great significance to the fact that it was defense counsel, rather than defendant, who made the request, and because defense counsel had used his objection to the prosecutor's reference to the bandage incident in closing argument to point out that "the inference to be drawn was the same [whether it was counsel or defendant who asked for the bandages]: not that defendant was attempting to conceal or alter his appearance . . . but instead that an effort was made to equalize the appearance of the subjects and neutralize the unfairness of having one conspicuously scarred person in the group." *Id.*

By claiming in his objection that the bandages were requested simply to preserve petitioner's right to a fair lineup rather than to conceal his guilt, trial counsel did not leave objectionable testimony unaddressed, and as the court of appeal held, it is highly improbable that the jury gave any different weight to the false evidence that petitioner requested the bandages than it would have to correct testimony that it was defense counsel. Thus, counsel's failure to object to the inaccurate testimony did not prejudice defendant and there was no Sixth Amendment violation. The state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

## II.     Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct in eliciting and not correcting the false testimony from Detective Oglesby discussed above, and in making a consciousness of guilt argument based upon that testimony.

The court of appeal rejected the claim:

> We find that misconduct occurred. Although Detective Oglesby testified that defendant made the request to have "the band-aid placed beneath all the participants' right eyes," the prosecutor was aware that representation of the evidence was erroneous. More importantly, by asserting that defendant was attempting to "hide" his scar, the prosecutor was mischaracterizing the evidence. The known reason for the bandages was to create a fair lineup without the suggestiveness of a single person with a noticeable scar, not to conceal defendant's identity. The prosecutor's effort to portray the request by the defense for bandages on the faces of the lineup participants as consciousness of guilt on the part of defendant was a deceptive and misleading argument, even if it was not technically outside the scope of the evidence. The prosecutor was not entitled to use defendant's effort to invoke his due process right to a fair, unsuggestive lineup to imply concealment of evidence and consciousness of guilt.
>
> We find that the comment was not prejudicial to defendant, however, even if considered in conjunction with Detective Oglesby's testimony. If misconduct occurs, "we determine whether it is 'reasonably probable that a result more favorable to the defendant would have occurred' absent the misconduct. [Citation.]" (*People v. Welch* (1999) 20 Cal. 4th 701, 753.) Here, defense counsel objected to the prosecutor's remark, and presented the contrary position that the bandages were used to achieve an impartial lineup, not obscure identity. From Detective Oglesby's testimony the jury knew that all of the lineup participants, not just defendant, wore bandages. Thus, the jury was presented with the necessary evidence to draw the inference mentioned by defense counsel that the reason for the bandages was to facilitate a fair lineup. Sablad's identification testimony was strong,

9

1     and corroborated by the discovery in defendant's residence of a gray
2     sweatsuit that matched the one worn by the robber as described by the victim
    and seen in the store videotape.  The presence of a scar on defendant's face
3     was only a minor aspect of the identification process, and was in fact not seen
    by the witness either in the lineups or at trial.  We conclude that a more
4     favorable verdict to defendant was not reasonably probable without the
    misconduct.

5 Ex. 12 at 13-14.

6         To prevail on a habeas claim for violation of a prosecutor's duty not to present or fail
7 to correct false evidence, the "petitioner must show that (1) the testimony (or evidence) was
8 actually false, (2) the prosecution knew or should have known that the testimony was
9 actually false, and (3)  . . . the false testimony was material." *Hayes v. Brown*, 399 F.3d
10 972, 984 (2005) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).
11 As to the third element, when a prosecutor obtains a conviction by the use of testimony
12 which he knows or should know is perjured, on habeas review the conviction must be set
13 aside if there is "any reasonable likelihood" that the false evidence could have affected the
14 jury's judgment.  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  The same result occurs
15 when the prosecutor, although not soliciting false evidence, allows it to go uncorrected
16 when it appears.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The harmless-error standard
17 applicable to most habeas claims, that set out in *Brecht v. Abrahamson*, 507 U.S. 619, 637-
18 38 (1993), is inapplicable to habeas claims that a prosecutor violated the duty not to
19 present false evidence or to fail to correct it.  *Hayes*, 399 F.3d at 984.

20         Defense counsel objected to the prosecutor's statement in closing argument that the
21 request for a bandage over petitioner's scar indicated a consciousness of guilt, saying that
22 in conducting lineups it was standard procedure to "try to obstruct a scar."  Ex. 5 at 361-62.
23 As the court of appeal noted, this was supported by Detective Oglesby's testimony that all
24 of the participants were given bandages in the same place, which implies that the
25 procedure was a proper one in the conduct of lineups.  Ex.12 at 14.  And the victim's
26 identifications of petitioner were very strong.  These factors make it unlikely that the false
27 evidence and the prosecutor's improper closing argument carried any weight with the jury.
28 The court concludes that there was no reasonable likelihood that the false evidence

10

1 affected the jury's judgment. Because there was no constitutional violation, the state
2 appellate courts' rejection of petitioner's prosecutorial misconduct claim was not contrary to,
3 or an unreasonable application of, clearly established United States Supreme Court
4 authority.

### III.  Unduly Suggestive Identification Procedures

Petitioner contends that his due process rights were violated by the use of an unduly suggestive photo identification procedure. Victim Sablad identified him from a group of nine photographs, a group in which petitioner contends that only he had a facial scar and that three of the photographed individuals had a lighter skin tone.

The court of appeal addressed petitioner's federal claim:

> Determining whether the identification violates due process has two components. First, we must determine whether the pretrial identification procedure was unduly suggestive. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107; *People v. Gordon* (1990) 50 Cal. 3d 1223, 1242; *People v. Nguyen* (1994) 23 Cal. App. 4th 32, 37-38.) Impermissible unfairness exists in a pretrial identification procedure "if it suggests in advance of a witness's identification the identity of the person suspected by the police." (*People v. Brandon* (1995) 32 Cal. App. 4th 1033, 1052; *see also People v. Pervoe* (1984) 161 Cal. App. 3d 342, 358.) "A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification. The defendant bears the burden of proving unfairness as a 'demonstrable reality,' not just speculation." (*People v. Contreras* (1993) 17 Cal. App. 4th 813, 819; *see also People v. DeSantis* (1992) 2 Cal.4th 1198, 1222; *People v. Brandon*, *supra*, at p. 1051.) " '[I]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.)
>
> Second, "[a]ssuming the procedure is unduly suggestive and unnecessary, the court must next decide whether the in-court identification was nevertheless reliable under the totality of the circumstances. In so doing, the court examines, 'the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation ... [citation].' [Citations.]" (*People v. Nguyen, supra*, 23 Cal. App. 4th 32, 38; *see also People v. Ochoa, supra*, 19 Cal.4th 353, 412.) " ' "If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable. [Citation.]" ' [Citation.]" (*People v. Phan* (1993) 14 Cal. App. 4th 1453, 1461; *see also People v. DeSantis, supra*, 2 Cal.4th 1198, 1222.)
>
> "On review we must consider the totality of the circumstances to determine whether the identification procedure was unconstitutionally suggestive. We must resolve all evidentiary conflicts in favor of the trial court's findings and uphold them if supported by substantial evidence."

11

(*People v. Contreras*, *supra*, 17 Cal. App. 4th 813, 819.)

We have reviewed the record before us and do not find that the photo lineup was unfair.  Defendant's claim of suggestiveness i[s] based primarily upon the inclusion of his photograph as the only one in the lineup "of an individual with a scar on his face."  Nothing in the use of a single photograph that depicted a person with a facial scar rendered the lineup inherently suggestive, however.  Rather than focus on a single attribute, we must "review the totality of the circumstances in determining whether an identification procedure was unconstitutionally suggestive." (*People v. Wimberly* (1992) 5 Cal. App. 4th 773, 788.)  Each case turns on its own facts. (*People v. Contreras, supra*, 17 Cal. App. 4th 813, 823.)  The scar was not a component in the photo lineup identification.  In fact, when the witness made the identification of photograph number seven he expressed concern that he did not observe a scar on defendant's photograph.  Detective Oglesby also testified that a scar was not visible in the photograph of defendant used in the lineup.  Thus, the identification was entirely based upon other factors.

Defendant also points out that "at least three pictures" in the photo lineup were of persons with complexions that were "significantly lighter" than his own.  We find that the complexion disparity of some of the subjects in the photographs does not render the lineup unduly suggestive.  "[T]here is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance." (*People v. Brandon*, *supra*, 32 Cal. App. 4th 1033, 1052; *see also People v. Blair* (1979) 25 Cal.3d 640, 661.) "Because human beings do not look exactly alike, differences are inevitable.  The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal. 4th 312, 367.)  "[T]he crucial issue is whether appellant has been singled out and his identification made a foregone conclusion under the circumstances...." (*People v. Faulkner* (1972) 28 Cal. App. 3d 384, 391; *see also People v. Floyd* (1970) 1 Cal. 3d 694, 712; *People v. Vallez* (1978) 80 Cal. App. 3d 46, 55.)  All of the photographs were of African-American males generally of the same age, height and weight and build, and with a general resemblance to each other.  The fact that a few of the nine photographs depicted men with complexions lighter than defendant did not single him out for identification.  Nothing in the record before us indicates that defendant's photograph was conspicuous, and the differences in features among the participants did not make the lineup suggestive. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217; *People v. Phan*, *supra*, 14 Cal. App. 4th 1453, 1462; *People v. Burke* (1980) 102 Cal. App. 3d 932, 941.)

Finally, we also find nothing in the lineup procedure itself that demonstrates unfairness.  The presentation of the photographs to the witness was entirely neutral.  The witness was given cautionary instructions that the person who committed the crime was not necessarily among the group of photographs, and an identification was not required.  The photographs were handed to the witness in a "stack," and he looked through them on his own.  The photographic identification was not based on any suggestive elements, but instead the witness's observations.  Upon review of the totality of circumstances, we concur with the trial court's assessment that the photo lineup, even if it did not meet optimal standards of reliability, was not impermissibly suggestive. (*People v. Carpenter*, *supra*, 15 Cal.4th 312, 367.) [FN5.  We therefore find that defendant's counsel was not remiss for failing to make another motion to dismiss on the ground of an unduly suggestive lineup

before the second trial.]

Ex. 12 at 5-8.

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall v. Denno*, 388 U.S. 293, 297 (1967). Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive. Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony; reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 100-14 (1977). In-court identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). A reviewing court may assume suggestiveness and review reliability first. *Id.* at 1339. The ultimate question of the constitutionality of pretrial identification procedures is a mixed question of law and fact. *Id.* at 1336; *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984).

Of the nine persons photographed, three had lighter skin tone than petitioner and only petitioner had a facial scar. As to the scar, however, although Sablad initially testified that in the photo lineup the individual he chose had a scar on his face, when viewing the photographs again in court he was not able to see a scar. Ex. 5. at 69-70. Detective Oglesby testified that he could not see a scar on petitioner's face in the photo lineup which was precisely why he concluded the lineup was fair and petitioner did not "stand out." *Id.* at 130. And even if three of those in the lineup had lighter skin than petitioner, that still left five about whom petitioner raises no complaint. The photo array was not unduly suggestive.

Alternatively, the court will assume suggestiveness and consider the reliability of the in-court identification. If the identification procedure is suggestive, the central question

13

becomes whether "under the "totality of the circumstances" the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  Factors to be used in evaluating reliability include, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.  *Id.* at 200.

In *Neil*, the court found that although "police did not exhaust all possibilities in seeking persons physically comparable to respondent," the identification was reliable and exclusion of the identification was not warranted.  *Id.* at 199.  Here, Sablad positively identified petitioner in a live lineup, where the scar was covered by a band-aid.  Ex. 5 at 61-62.  Sablad additionally identified petitioner in court, Ex. 7 at 18, and expressed confidence that he had identified the correct individual (responding "no" to defense counsel's question "do you have any doubt in your mind that the person that you're pointing to is the person who robbed you that day?"), Ex. 5 at 63-64.  Sablad had ample opportunity to view petitioner at the time of the crime and testified that he was specifically focused on remembering his attacker's appearance to ensure that he could provide the police with an accurate description.  Ex. 7 at 26-27.  Immediately following the incident Sablad gave a relatively accurate description of the robber, identifying his race, gender, build, approximate age range, distinguishing facial characteristic, and apparel.  *Id.* at 97-98, 125.  Even assuming that the procedure was suggestive, the identification was sufficiently reliable to outweigh its corrupting effects.

The court concludes that there was not a "very substantial likelihood of irreparable misidentification" as a product of the photo lineup, and that accordingly there was no due process error in admitting the evidence.  The state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.

///

///

**IV.    Admission of Handgun**

Petitioner asserts that his due process rights were violated when the trial court allowed the prosecution to use a real handgun belonging to Detective Cisneros as demonstrative evidence, when nothing in the record indicates that the gun used by the robber was a real one.

**A.    Timeliness**

Respondent contends that this claim is barred by the statute of limitations. This claim was included in petitioner's original petition, which was filed within one year of completion of direct review. The claim is not untimely.

**B.    Merits**

At the second trial, the prosecutor showed the victim a small silver revolver and the witness said that the gun used by the person who robbed him was "exactly that size." Ex. 7 at 24. Later, another witness, Detective Cisneros, identified the same revolver as a handgun from his "personal collection," and testified that it was not the one used in the robbery. Ex. 5-3 at 167-68.

The court of appeal held that the exemplar handgun was relevant to whether the victim was put in fear by having one similar to it pointed at him, that a proper foundation was laid, and that the gun's probative value exceeded its potential prejudicial effect. Ex. 12 at 15-17.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Petitioner does not allege violation of a constitutional guarantee other than due process.

As the court of appeal held, the handgun was relevant to the fear element of robbery, and petitioner's position is not that no robbery took place, but rather that he did not commit it. Admission of the handgun had some bearing on an issue in the case, whether the victim's seeing a similar gun would have put him in fear, but no effect one way or the

15

other on the defense that petitioner was not the robber. Thus admission of it did not make the trial fundamentally unfair, and the admission did not violate due process. Because there was no constitutional violation, the state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.

## V.   Cumulative Error

Petitioner alleges that his above claims, even if they do not amount to constitutional error in themselves, when added together show that the trial as a whole was a violation of due process, i.e., cumulative error. But when there is no constitutional error, there is nothing to accumulate. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Here, the court has determined above that there was no constitutional error. This claim therefore is without merit.

## VI.   Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

A COA will be granted on the two issues regarding false testimony, those labeled IB and II above, as reasonable jurists could disagree with the court's conclusions there.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. A Certificate of Appealability is **GRANTED** on issues IB and II. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: October 14, 2011.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.06\DOW1219.RUL2.wpd